## FLETCHER v. PECK.

ERROR to the circuit court for the district of Massachusetts, in an action of covenant brought by Flecher against Peck.

The *first* count of the declaration states that Peck, by his deed of bargain and sale dated the 14th of May, 1803, in consideration of 3,000 dollars, sold and conveyed to Fletcher, 15,000 acres of land lying in common and undivided in a tract described as follows: beginning on the river Mississippi, where the latitude 32 deg. 40 min. north of the equator intersects the same, running thence along the same parallel of latitude a due east course to the Tombigby river, thence up the said Tombigby river to where the latitude of 32 deg. 43 min. 52 sec. intersects the same, thence along the same parallel of latitude a due west course to the Mississippi; thence down the said river, to the place of beginning; the said described tract containing 500,000 acres, and is the same which was conveyed by Nathaniel Prime to Oliver Phelps, by deed dated the 27th of February, 1796, and of which the said Phelps conveyed four fifths to Benjamin Hichborn, and the said Peck by deed dated the 8th of December, 1800; the said tract of 500,000 acres, being part of a tract which James Greenleaf conveyed to the said N. Prime, by deed dated the 23d of September, 1795, and is parcel of that tract which James Gunn, Mathew M'Allister, George Walker, Zachariah Cox, Jacob Walburger, William Longstreet and Wade Hampton, by deed dated 22d of August, 1795, conveyed to the said James Greenleaf; the same being part of that tract which was granted by letters patent under the great seal of the state of Georgia, and the signature of George Matthews, Esq. governor of that state, dated the 13th of January, 1795, to the said James Gunn and others, under the name of James Gunn, Mathew M'Allister, and George

If the breach of covenant assigned be, that the *state* had no authority to sell and dispose of the land, it is not a good plea in bar to say that the governor was legally empowered to sell and convey the premises, although the facts stated in the plea as inducement, are sufficient to justify a direct negative of the breach assigned.

It is not necessary that a breach of covenant be assigned in the very words of the covenant. It is sufficient if it show a substantial breach.

The court will not declare a law to be unconstitutional; unless the opposition between the constitution and the law be clear and plain.

The legislature of Georgia, in 1795, had the power of disposing of the unappropriated lands within its own limits.

FLETCHER
v.
PECK.

In a contest between two individuals, claiming under an act of a legislature, the court cannot inquire into the motives which actuated the members of that legislature. It the legislature might constitutionally pass such an act; if the act be clothed with all the requisite forms of a law, a court, sitting as a court of law, cannot sustain a suit between individuals founded on the allegation that the act is a nullity in consequence of the impure motives, which influenced certain members of the legislature which passed the law. When a law is in its nature a contract, when absolute rights have vested under that contract, a repeal of the law cannot devest those rights.
A party to a contract cannot pronounce its own deed invalid, although that party be a sovereign state.

Walker and their associates, and their heirs and assigns in fee-simple, under the name of the Georgia company; which patent was issued by virtue of an act of the legislature of Georgia, passed the 7th of January, 1795, entitled "An act supplementary to an act for appropriating part of the unlocated territory of this state for the payment of the late state troops, and for other purposes therein mentioned, and declaring the right of this state to the unappropriated territory thereof, for the protection and support of the frontiers of this state, and for other purposes."

That Peck, in his deed to Fletcher, covenanted "that the state of Georgia aforesaid was, at the time of the passing of the act of the legislature thereof, (entitled as aforesaid,) legally seised in fee of the soil thereof, subject only to the extinguishment of part of the Indian title thereon. And that the legislature of the said state at the time of passing the act of sale aforesaid, had good *right* to sell and dispose of the same in manner pointed out by the said act. And that the governor of the said state had lawful authority to issue his grant aforesaid, by virtue of the said act. And further, that all the title which the said state of Georgia ever had in the aforegranted premises has been legally conveyed to the said John Peck by force of the conveyances aforesaid. And further, that the title to the premises so conveyed by the state of Georgia, and finally vested in the said Peck, has been in no way constitutionally or legally impaired by virtue of any subsequent act of any subsequent legislature of the said state of Georgia."

The breach assigned in the first count was, that at the time the said act of 7th of January, 1795, was passed, "the said legislature had no *authority* to sell and dispose of the tenements aforesaid, or of any part thereof, in the manner pointed out in the said act."

The 2d count, after stating the covenants in the deed as stated in the first count, averred, that at *Augusta,* in the said state of Georgia, on the 7th day of January, 1795, the said James Gunn, Mathew M'Allister

and George Walker, promised and assured divers members of the legislature of the said state then duly and legally sitting in general assembly of the said state, that if the said members would assent to and vote for the passing of the act of the said general assembly, entitled as aforesaid, the same then being before the said general assembly in the form of a bill, and if the said bill should pass into a law, that such members should have a share of, and be interested in, all the lands, which they the said Gunn, M'Allister and Walker, and their associates, should purchase of the said state by virtue of and under authority of the same law: and that divers of the said members to whom the said promise and assurance was so made as aforesaid, were unduly influenced thereby, and under such influence did then and there vote for the passing the said bill into a law; by reason whereof the said law was a nullity, and from the time of passing the same as aforesaid was, ever since has been, and now is, absolutely void and of no effect whatever ; *and that the title which the said state of Georgia had in the aforegranted premises at any time whatever was never legally conveyed to the said Peck, by force of the conveyances aforesaid.*"

FLETCHER
v.
PECK.

A grant is a contract. executed.

A law, annulling conveyances, is unconstitutional, because it is a law impairing the obligation of contracts, within the meaning of the constitution of the United States.

The proclamation of the King of Great Britain in 1763 did not alter the boundaries of Georgia.

The nature of the Indian title is not such as to be absolutely repugnant to seisure in fee on the part of the state.

The *third* count, after repeating all the averments and recitals contained in the *second*, further averred, that after the passing of the said act, and of the execution of the patent aforesaid, the general assembly of the state of Georgia, being a legislature of that state subsequent to that which passed the said act, at a session thereof, duly and legally holden at Augusta, in the said state, did, on the 13th of February, 1796, because of the undue influence used as aforesaid, in procuring the said act to be passed, and for other causes, pass another certain act in the words following, that is to say, " An act declaring null and void a certain usurped act passed by the last legislature of this state at Augusta, the 7th day of January, 1795, under the pretended title of ' An act supplementary to an act entitled an act for appropriating a part of the unloca-

Vol. VI.                    M

ted territory of the state for the payment of the late state troops, and for other purposes therein mentioned, declaring the right of this state to the unappropriated territory thereof for the protection of the frontiers, and for other purposes' and for expunging from the public records the said usurped act, and declaring the right of this state to all lands lying within the boundaries therein mentioned."

By which, after a long preamble, it is enacted, That the said usurped act passed on the 7th of January, 1795, entitled, &c. be, and the same is hereby declared, null and void, and the *grant* or grants right or rights, claim or claims, issued, deduced, or derived therefrom, or from any clause, letter or spirit of the same, or any part of the same, is hereby also anulled, rendered void, and of no effect; and as the same was made without constitutional authority, and fraudulently obtained, it is hereby declared of no binding force or effect on this state, or the people thereof, but is and are to be considered, both *law* and *grant*, as they ought to be, *ipso facto*, of themselves, void, and the territory therein mentioned is also hereby declared to be the sole property of the state, subject only to the right of treaty of the United States to enable the state to purchase under its pre-emption right, the Indian title to the same."

The 2d section directs the enrolled law, the grant, and all deeds, contracts, &c. relative to the purchase, to be expunged from the records of the state, &c.

The 3d section declares that neither the law nor the grant, nor any other conveyance, or agreement relative thereto, shall be received in evidence in any court of law or equity in the state so far as to establish a right to the territory or any part thereof, but they may be received in evidence in private actions between individuals for the recovery of money paid upon pretended sales, &c.

The 4th section provides for the repayment of money, funded stock, &c. which may have been paid into the treasury, provided it was then remaining

therein, and provided the repayment should be demanded within eight months from that time.

The 5th section prohibits any application to congress, or the general government of the United States for the extinguishment of the Indian claim; and

The 6th section provides for the promulgation of the act.

The count then assigns a breach of the covenant in the following words, viz. " And by reason of the passing of the said last-mentioned act, and by virtue thereof, the title which the said Peck had, as aforesaid, in and to the tenements aforesaid, and in and to any part thereof, was constitutionally and legally impaired, and rendered null and void."

The 4th count, after reciting the covenants as in the first, assigned as a breach, " that at the time of passing of the act of the 7th of January, 1795, the United States of America were seised in fee-simple of all the tenements aforesaid, and of all the soil thereof, and that at that time the State of Georgia was not seised in fee-simple of the tenements aforesaid, or of any part thereof, nor of any part of the soil thereof, subject only to the extinguishment of part of the Indian title thereon."

The defendant pleaded four pleas, viz.

1st plea. As to the breach assigned in the first count, he says,

That on the 6th of May, 1789, at Augusta, in the State of Georgia, the people of that state by their delegates, duly authorized and empowered to form, declare, ratify, and confirm a constitution for the government of the said state, did form, declare, ratify, and confirm such constitution, in the words following:

Here was inserted the whole constitution, the 16th section of which declares, that the general assembly hall have power to make all laws and ordinances

which they shall deem necessary and proper for the good of the state which shall not be repugnant to this constitution. The plea then avers, that until and at the ratification and confirmation aforesaid of the said constitution, the people of the said state were seised, among other large parcels of land, and tracts of country, of all the tenements described by the said Fletcher in his said first count, and of the soil thereof in absolute sovereignty, and in fee-simple; (subject only to the extinguishment of the Indian title to part thereon;) and that upon the confirmation and ratification of the said constitution, and by force thereof, the said State of Georgia became seised in absolute sovereignty, and in fee-simple, of all the tenements aforesaid, with the soil thereof, subject as aforesaid; the same being within the territory and jurisdiction of the said state, and the same state continued so seised in fee-simple, until the said tenements and soil were conveyed by letters patent under the great seal of the said state, and under the signature of George Matthews, Esq. governor thereof, in the manner and form mentioned by the said Fletcher in his said first count. And the said Peck further saith, that on the 7th of January, 1795, at a session of the general assembly of the said state duly holden at Augusta within the same, according to the provisions of the said constitution, the said general assembly, then and there possessing all the powers vested in the legislature of the said state by virtue of the said constitution, passed the act above mentioned by the said Fletcher in the assignment of the breach aforesaid, which act is in the words following, that is to say, " An act supplementary," &c.

Here was recited the whole act, which, after a long preamble, declares the jurisdictional and territorial rights, and the fee-simple to be in the state, and then enacts, that certain portions of the vacant lands s' ould be sold to four distinct associations of individuals, calling themselves respectively, " The Georgia Company," "The Georgia Mississippi Company," " The Upper Mississippi Company," and " The Tennessee Company."

The tract ordered to be sold to James Gunn and

others, (the Georgia Company,) was described as fol-
lows: "All that tract or parcel of land, including
islands, situate, lying and being within the following
boundaries; that 'is to say, beginning on the Mobile
bay where the latitude 31 deg. north of the equator,
intersects the same, running thence up the said bay to
the mouth of lake *Tensaw;* thence up the said lake
Tensaw to the Alabama river, including Curry's, and
all other islands therein; thence up the said Alabama
river to the junction of the Coosa and Oakfushee
rivers; thence up the Coosa river above the big shoals
to where it intersects the latitude of thirty-four de-
grees north of the equator; thence a due west course
to the Mississippi river; thence down the middle of
the said river to the latitude 32 deg. 40 min.; thence,
a due east course to the Don or Tombigby river;
thence down the middle of the said river to its junc-
tion with the Alabama river; thence down the mid-
dle of the said river to Mobile bay; thence down the
Mobile bay to the place of beginning.

Upon payment of 50,000 dollars, the governor was
required to issue and sign a grant for the same, taking
a mortgage to secure the balance, being 200,000 dol-
lars, payable on the first of November, 1795.

The plea then avers, that all the tenements described
in the first count are included in, and parcel of, the
lands in the said act to be sold to the said Gunn,
M'Allister, and Walker and their associates, as in the
act is mentioned.

And that by force and virtue of the said act, and of
the constitution aforesaid, of the said state, the said
*Matthews,* governor of the said state, was fully and le-
gally empowered to sell and convey the tenements
aforesaid, and the soil thereof, subject as aforesaid, in
fee-simple by the said patent under the seal of the
said state, and under his signature, according to the
terms, limitations, and conditions in the said act men-
tioned. And all this he is ready to verify; wherefore,
&c.

To this plea there was a general demurrer and joinder.

2d plea. To the second count the defendant, "protesting that the said Gunn, M'Allister, and Walker did not make the promises and assurances to divers members of the legislature of the said state of Georgia, supposed by the said Fletcher in his second count, for plea saith, that until after the purchase by the said Greenleaf, as is mentioned in the said second count, neither he the said defendant, nor the said Prime, nor the said Greenleaf, nor the said Phelps, nor the said Hichborn, nor either of them, had any notice nor knowledge that any such promises and assurances were made by the said Gunn, M'Allister and Walker, or either of them, to any of the members of the legislature of the said State of Georgia, as is supposed by the said Fletcher in his said second count, and this he is ready to verify," &c.

To this plea also there was a general demurrer and joinder.

3d plea to the third count was the same as the second plea, with the addition of an averment that Greenleaf, Prince, Phelps, Hichborn and the defendant were, until and after the purchase by Greenleaf, on the 22d of August, 1795, and ever since have been, citizens of some of the United States other than the State of Georgia.

To this plea also there was a general demurrer and joinder.

4th Plea. To the fourth count, the defendant pleaded that at the time of passing the act of the 7th of January, 1795, the State of Georgia was seised in fee-simple of all the tenements and territories aforesaid, and of all the soil thereof, subject only to the extinguishment of the Indian title to part thereof, and of this he puts himself *on the country*, and the plaintiff likewise.

6

Upon the issue joined upon the fourth plea, the jury found the following special verdict, viz.

That his late majesty, Charles the second, King of Great Britain, by his letters patent under the great seal of Great Britain, bearing date the thirtieth day of June, in the seventeenth year of his reign, did grant unto Edward Earl of Clarendon, George Duke of Albemarle, William Earl of Craven, John Lord Berkeley, Antony Lord Ashby, Sir George Carteret, Sir John Colleton, and Sir William Berkeley, therein called lords proprietors, and their heirs and assigns, all that province, territory, or tract of ground, situate, lying and being in North America, and described as follows : extending north and eastward as far as the north end of Carahtuke river or gullet; upon a straight westerly line to Wyonoahe creek, which lies within or about the degrees of thirty-six and thirty minutes of northern latitude, and so west in a direct line as far as the South Seas, and south and westward as far as the degrees of twenty-nine inclusive, northern latitude, and so west in a direct line as far as the South Seas, (which territory was called Carolina,) together with all ports, harbours, bays, rivers, soil, land, fields, woods, lakes, and other rights and privileges therein named ; that the said lords proprietors, grantees aforesaid, afterwards, by force of said grant, entered upon and took possession of said territory, and established within the same many settlements, and erected therein fortifications and posts of defence.

And the jury further find, that the northern part of the said tract of land, granted as aforesaid to the said lords proprietors, was afterwards created a colony by the King of Great Britain, under the name of North Carolina, and that the most northern part of the thirty-fifth degree of north latitude was then and ever afterwards the boundary and line between North Carolina and South Carolina, and that the land, described in the plaintiff's declaration, is situate in that part of said tract, formerly called Carolina, which was afterwards a colony called South Carolina, as aforesaid; that afterwards, on the twenty-sixth day of July, in the

third year of the reign of his late majesty George the second, King of Great Britain, and in the year of our Lord one thousand, seven hundred and twenty-nine, the heirs or legal representatives of all the said grantees, except those of Sir George Carteret, by deed of indenture, made between authorized agents of the said King George the second, and the heirs and representatives of the said grantees, in conformity to an act of the parliament of said kingdom of Great Britain, entitled, " An act for establishing an agreement with seven of the lords proprietors of Carolina for the surrender of their title and interest in that province to his majesty," for and in consideration of the sum of twenty-two thousand five hundred pounds of the money of Great Britain, paid to the said heirs and representatives of the said seven of the lords proprietors, by the said agent of the said king, sold and surrendered to his said majesty, King George the second, all their right of soil, and other privileges to the said granted territory ; which deed of indenture was duly executed and was enrolled in the chancery of Great Britain, and there remains in the chapel of the rolls. That afterwards, on the ninth day of December, one thousand, seven hundred and twenty-nine, his said majesty, George the second, appointed Robert Johnson, Esq. to be governor of the province of South Carolina, by a commission under the great seal of the said kingdom of Great Britain ; in which commission the said Governor Johnson is authorized to grant lands within the said province, but no particular limits of the said province is therein defined.

And the jury further find, that the said Governor of South Carolina did exercise jurisdiction in and over the said colony of South Carolina under the commission aforesaid, claiming to have jurisdiction by force thereof as far southward and westward as the southern and western bounds of the aforementioned grant of Carolina, by King Charles the second, to the said lords proprietors, but that he was often interrupted therein and prevented therefrom in the southern and western parts of said grants by the public enemies of the King of Great Britain, who at divers times

had actual possession of the southern and western parts aforesaid. That afterwards the right honourable Lord Viscount Percival, the honourable Edward Digby, the honourable George Carpenter, James Oglethorpe, Esq. with others, petitioned the lords of the committee of his said majesty's privy council for a grant of lands in South Carolina, for the charitable purpose of transporting necessitous persons and families from London to that province, to procure there a livelihood by their industry, and to be incorporated for that purpose ; that the lords of the said privy council referred the said petition to the board of trade, so called, in Great Britain, who, on the seventeenth day of December, in the year of our Lord one thousand seven hundred and thirty, made report thereon, and therein recommended that his said majesty would be pleased to incorporate the said petitioners as a charitable society, by the name of " The Corporation for the purpose of establishing charitable colonies in America, with perpetual succession." And the said report further recommended, that his said majesty be pleased " to grant to the said petitioners and their successors for ever, all that tract of land in his province of South Carolina, lying between the rivers Savannah and Alatamaha, to be bounded by the most navigable and largest branches of the Savannah, and the most southerly branch of the Alatamaha." And that they should be separated from the province of South Carolina, and be made a colony independent thereof, save only in the command of their militia. That afterwards, on the twenty-second day of December, one thousand seven hundred and thirty-one, the said board of trade reported further to the said lords of the privy council, and recommended that the western boundary of the new charter of the colony, to be established in South Carolina, should extend as far as that described in the ancient patents granted by King Charles the second to the late lords proprietors of Carolina, whereby that province was to extend westward in a direct line as far as the South Seas. That afterwards, on the ninth day of June, in the year of our Lord one thousand seven hundred and thirty-two, his said majesty, George the

FLETCHER
v
PECK.

FLETCHER
v.
PECK.

second, by his letters patent, or royal charter, under the great seal of the said kingdom of Great Britain, did incorporate the said Lord Viscount Percival and others, the petitioners aforesaid, into a body politic and corporate, by the name of " The trustees for establishing the colony of Georgia, in America, with perpetual succession ;" and did, by the same letters patent, give and grant in free and common socage, and not *in capite*, to the said corporation and their successors, seven undivided parts (the whole into eight equal parts to be divided) of all those lands, countries and territories, situate, lying and being in that part of South Carolina in America, which lies from a northern stream of a river there commonly called the Savannah, all along the sea-coast to the southward unto the most southern branch of a certain other great water or river, called the Alatamaha, and westward from the heads of the said rivers respectively in direct lines to the South Seas, and all the lands lying within said boundaries, with the islands in the sea, lying opposite to the eastern coast of the same, together with all the soils, grounds, havens, bays, mines, minerals, woods, rivers, waters, fishings, jurisdictions, franchises, privileges, and pre-eminences within the said territories. That afterwards, in the same year, the right honourable John Lord Carteret, Baron of Hawnes, in the county of Bedford, then Earl Granville, and heir of the late Sir George Carteret, one of the grantees and lords proprietors aforesaid, by deed of indenture between him and the said trustees for establishing the colony of Georgia in America, for valuable consideration therein mentioned, did give, grant, bargain and sell unto the said trustees for establishing the colony of Georgia aforesaid, and their successors, all his one undivided eighth part of or belonging to the said John Lord Carteret (the whole into eight equal parts to be divided) of, in, and to the aforesaid territory, seven undivided eight parts of which had been before granted by his said majesty to said trustees.

And the jury further find, that one eighth part of the said territory, granted to the said lords proprietors, and called Carolina as aforesaid, which eighth part be-

longed to Sir George Carteret, and was not surrendered as aforesaid, was afterwards divided and set off in severalty to the heirs of the said Sir George Carteret in that part of said territory which was afterwards made a colony by the name of North Carolina. That afterwards, in the same year, the said James Oglethorpe, Esq. one of the said corporation, for and in the name of and as agent to the said corporation, with a large number of other persons under his authority and control, took possession of said territory, granted as aforesaid to the said corporation, *made a treaty with some of the native Indians within said territory*, in which, for and in behalf of said corporation, he made *purchases of said Indians of their native rights to parts of said territory*, and erected forts in several places to keep up marks of possession. That afterwards, on the sixth day of September, in the year last mentioned, on the application of said corporation to the said board of trade, they the said board of trade, in the name of his said majesty, sent instructions to said Robert Johnson, then Governor of South Carolina, thereby willing and requiring him to give all due countenance and encouragement for the settling of the said colony of Georgia, by being aiding and assisting to any settlers therein: and further requiring him to cause to be registered the aforesaid charter of the colony of Georgia, within the said province of South Carolina, and the same to be entered of record by the proper officer of the said province of South Carolina.

And the jury further find, that the Governor of South Carolina, after the granting the said charter of the colony of Georgia, did exercise jurisdiction south of the southern limits of said colony of Georgia, claiming the same to be within the limits of his government; and particularly that he had the superintendency and control of a military post there, and did make divers grants of land there, which lands have ever since been holden under his said grants. That afterwards, in the year of our Lord one thousand seven hundred and fifty-two, by deed of indenture made between his said majesty, George the second, of the one part, and the said trustees for establishing the

colony in America of the other part, they the said
trustees, for divers valuable considerations therein
expressed, did, for themselves, and their successors,
grant, surrender, and yield up to his said majesty,
George the second, his heirs and successors, their said
letters patent, and their charter of corporation, and all
right, title and authority, to be or continue a corporate
body, and all their powers of government, and all
other powers, jurisdictions, franchises, pre-eminences
and privileges therein, or thereby granted or conveyed
to them; and did also grant and convey to his said
majesty, George the second, his heirs and successors,
all the said lands, countries, territories and premises,
as well the said one eighth part thereof granted by the
said John Lord Carteret to them as aforesaid, as also
the said seven eighth parts thereof, granted as afore-
said by his said majesty's letters patent or charter as
aforesaid, together with all the soils, grounds, havens,
ports, bays, mines, woods, rivers, waters, fishings,
jurisdictions, franchises, privileges and pre-eminences,
within said territories, with all their right, title, inte-
rest, claim or demand whatsoever in and to the pre-
mises; and which grant and surrender aforesaid, was
then accepted by his said majesty for himself and his
successors; and said indenture was duly executed on
the part of said trustees, with the privity and by the
direction of the common council of the said corpora-
tion by affixing the common seal of said corporation
thereunto, and on the part of his said majesty by
causing the great seal of Great Britain to be thereunto
affixed. That afterwards, on the sixth day of Au-
gust, one thousand seven hundred and fifty-four,
his said majesty, George the second, by his royal com-
mission of that date under the great seal of Great Bri-
tain, constituted and appointed John Reynolds, Esq.
to be captain-general and commander in chief in and
over said colony of Georgia in America, with the fol-
lowing boundaries, viz. lying from the most northerly
stream of a river there commonly called Savannah,
all along the sea coast to the southward unto the most
southern stream of a certain other great water or river
called the Alatahama, and westward from the heads
of the said rivers respectively, in straight lines to the
South Seas, and all the space, circuit and precinct of

land lying within the said boundaries, with the islands in the sea lying opposite to the eastern coast of said lands within twenty leagues of the same. That afterwards, on the tenth day of February, in the year of our Lord one thousand seven hundred and sixty-three, a definitive treaty of peace was concluded at Paris, between his catholic majesty, the King of Spain, and his majesty, George the third, King of Great Britain; by the twentieth article of which treaty, his said catholic majesty did cede and guaranty, in full right to his Britannic majesty, Florida, with fort St. Augustin, and the bay of Pensacola, as well as all that Spain possessed on the continent of North America, to the east or to the south east of the river Mississippi, and in general all that depended on the said countries and island, with the sovereignty, property, possession, and all rights acquired by treaties or otherwise, which the catholic king and the crown of Spain had till then over the said countries, lands, places, and their inhabitants; so that the catholic king did cede and make over the whole to the said king and the said crown of Great Britain, and that in the most ample manner and form.

That afterwards, on the seventh day of October, in the year of our Lord one thousand seven hundred and sixty-three, his said majesty, George the third, King of Great Britain, by and with the advice of his privy council, did issue his royal proclamation, therein publishing and declaring, that he, the said King of Great Britain, had, with the advice of his said privy council, granted his letters patent, under the great seal of Great Britain, to erect within the countries and islands ceded and confirmed to him by the said treaty, four distinct and separate governments, styled and called by the names of Quebec, East Florida, West Florida and Grenada; in which proclamation the said government of West Florida is described as follows, viz. Bounded to the southward by the gulf of Mexico, including all islands within six leagues of the coast from the river Apalachicola to lake Pontchartrain, to the westward by the said lake, the lake Maurepas, and the river Mississippi; to the northward by

a line drawn due east from that part of the river Mississippi which lies in thirty one-degrees of north latitude, to the river Apalachicola or Catahouchee; and to the eastward by the said river. And in the same proclamation the said government of East Florida is described as follows, viz. bounded to the westward by the gulf of Mexico and the Apalachicola river; to the northward by a line drawn from that part of the said river where the Catahouchee and Flint rivers meet, to the source of St. Mary's river, and by the course of the said river to the Atlantic Ocean; and to the east and south by the Atlantic Ocean and the gulf of Florida, including all islands within six leagues of the sea coast. And in and by the same proclamation, all lands lying between the rivers Alatamaha and St. Mary's were declared to be annexed to the said province of Georgia; and that in and by the same proclamation, it was further declared by the said king as follows, viz. " That it is our royal will and pleasure *for the present,* as aforesaid, to reserve under our sovereignty, protection and dominion for the use of the said Indians all the land and territories not included within the limits of our said three new governments, or within the limits of the territory granted to the Hudson's Bay Company, *as also all the land and territories lying to the westward of the sources of the rivers which fall into the sea from the west and north-west as aforesaid;* and we do hereby strictly forbid, on pain of our displeasure, all our loving subjects from making any purchases or settlements whatever, or taking possession of any of the lands above reserved, without our special leave and license for that purpose first obtained."

And the jury find, that the land described in the plaintiff's declaration *did lay to the westward of the sources of the rivers which fall into the sea from the west and north-west as aforesaid.* That afterwards, on the twenty-first day of November, in the year of our Lord one thousand seven hundred and sixty-three, and in the fourth year of the reign of said King George the third, he the said king, by his royal commission under the great seal of Great Britain, did constitute and ap-

point George Johnstone, Esq. captain-general and go-          FLETCHER
vernor in chief over the said province of West Florida in          v.
America; in which commission the said province was          PECK.
described in the same words of limitation and extent, as
in said proclamation is before set down. That after-
wards, on the twentieth day of January, in the year of
our Lord one thousand seven hundred and sixty-four,
the said King of Great Britain, by his commission under
the great seal of Great Britain, did constitute and ap-
point James Wright, Esq. to be the captain-general and
governor in chief in and over the colony of Georgia, by
the following bounds, viz. *bounded on the north by the
most northern stream of a river there commonly called Sa-
vannah, as far as the heads of the said river; and from
thence westward as far as our territories extend; on the
east, by the sea coast, from the said river Savannah
to the most southern stream of a certain other river,
called St. Mary;* (including all islands within twenty
leagues of the coast lying between the said river Sa-
vannah and St. Mary, as far as the head thereof;)
*and from thence westward as far as our territories ex-
tend by the north boundary line of our provinces of East
and West Florida.*

' That afterwards, from the year one thousand seven
hundred and seventy-five, to the year one thousand
seven hundred and eighty-three, an open war existed
between the colonies of New-Hampshire, Massachu-
setts Bay, Rhode Island and Providence Plantations,
Connecticut, New-York, New-Jersey, Pennsylvania,
Delaware, Maryland, Virginia, North Carolina, South
Carolina and Georgia, called the United States, on the
one part, and his said majesty, George the third,
King of Great Britain, on the other part. And on the
third day of September, in the year of our Lord one
thousand seven hundred and eighty-three, a definitive
treaty of peace was signed and concluded at Paris, by
and between certain authorized commissioners on the
part of the said belligerent powers, which was after-
wards duly ratified and confirmed by the said two re-
spective powers; by the first article of which treaty,
the said King George the third, by the name of his
Britannic majesty, acknowledged the aforesaid United

States to be free, sovereign and independent states; that he treated with them as such, and for himself, his heirs and successors, relinquishes all claim to the government, propriety and territorial rights of the same, and every part thereof; and by the second article of said treaty, the western boundary of the United States is a line drawn along the middle of the river Mississippi, until it shall intersect the northernmost part of the thirty-first degree of north latitude; and the southern boundary is a line drawn due east from the determination of the said line, in the latitude of thirty-one degrees north of the equator, to the middle of the river Apalachicola or Catahouchee; thence along the middle thereof to its junction with the Flint river; thence straight to the head of St. Mary's river; and thence down along the middle of St. Mary's river to the Atlantic Ocean.

And the jury further find, that in the year of our Lord one thousand seven hundred and eighty-two, the Congress of the United States did instruct the said commissioners, authorized on the part of the United States to negotiate and conclude the treaty aforesaid, that they should claim in this negotiation, respecting the boundaries of the United States, that the most northern part of the thirty-first degree of north latitude should be agreed to be the southern boundary of the United States, on the ground that that was the southern boundary of the colony of Georgia; and that the river Mississippi should be agreed to be the western boundary of the United States, on the ground that the colony of Georgia and other colonies, now states of the United States, were bounded westward by that river; and that the commissioners on the part of the United States did, in said negotiation, claim the same accordingly, and that on those grounds the said southern and western boundaries of the United States were agreed to by the commissioners on the part of the King of Great Britain. That afterwards, in the same year, the legislature of the state of Georgia passed an act, declaring her right, and proclaiming her title to all the lands lying within her boundaries to the river Mississipp. And in the year of our Lord, one thousand seven hundred

and eighty-five, the legislature of the said state of
Georgia established a county, by the name of Bourbon,
on the Mississippi, and appointed civil officers for said
county, which lies within the boundaries now deno-
minated the Mississippi territory; that thereupon a
dispute arose between the state of South Carolina and
the state of Georgia, concerning their respective bound-
aries, the said states separately claiming the same
territory; and the said state of South Carolina, on the
first day of June, in the year of our lord one thou-
sand seven hundred and eighty-five, petitioned the
congress of the United States for a hearing and deter-
mination of the differences and disputes subsisting be-
tween them and the state of Georgia, agreeably to the
ninth article of the then confederation and perpetual
union between the United States of America; that
the said congress of the United States did thereupon
on the same day resolve, that the second Monday in
May then next following should be assigned for the
appearance of the said states of South Carolina and
Georgia, by their lawful agents, and did then and there
give notice thereof to the said state of Georgia, by
serving the legislature of said state with an attested
copy of said petition of the state of South Carolina,
and said resolve of congress. That afterwards, on
the eighth day of May, in the year of our lord one
thousand seven hundred and eighty-six, by the joint
consent of the agents of said states of South Carolina
and Georgia, the congress resolved that further day
be given for the said hearing, and assigned the fif-
teenth day of the same month for that purpose. That
afterwards, on the eighteenth day of May aforesaid, the
said congress resolved, that further day be given
for the said hearing, and appointed the first Mon-
day in September, then next ensuing, for that pur-
pose. That afterwards, on the first day of Septem-
ber then next ensuing, authorized agents from the
states of Carolina and Georgia attended in pursuance
of the order of congress aforesaid, and produced their
credentials, which were read in congress, and there
recorded, together with the acts of their respective
legislatures; which acts and credentials authorized the
said agents to settle and compromise all the differences

and disputes aforesaid, as well as to appear and repre-sent the said states respectively before any tribunal that might be created by congress for that purpose, agreeably to the said ninth article of the confederation. And in conformity to the powers aforesaid, the said commissioners of both the said states of South Caro-lina and Georgia, afterwards, on the 28th day of April, in the year of our Lord one thousand seven hundred and eighty-seven, met at Beaufort, in the state of South Carolina, and then and there entered into, signed, and concluded a convention between the states of South Carolina and Georgia aforesaid. By the first article of which convention it was mutually agreed between the said states, that the most northern branch or stream of the river Savannah from the sea or mouth of such stream to the fork or confluence of the rivers then-called Tugaloo and Keowee; and from thence the most northern branch or stream of said river Tu-galoo, till it intersects the northern boundary line of South Carolina, if the said branch or stream of Tuga-loo extends so far north, reserving all the islands in the said rivers Savannah and Tugaloo, to Georgia; but if the head, spring, or source of any branch or stream of the said river Tugaloo, does not extend to the north boundary line of South Carolina, then a west course to the Mississippi, to be drawn from the head, spring, or source of the said branch or stream of Tu-galoo river, which extends to the highest northern la-titude, shall for ever thereafter form the separation, limit, and boundary between the states of South Caro-lina and Georgia. And by the third article of the convention aforesaid, it was agreed by the said states of South Carolina and Georgia, that the said state of South Carolina should not thereafter claim any lands to the eastward, southward, south-eastward, or west of the said boundary above established; and that the said state of South Carolina did relinquish and cede to the said state of Georgia all the right, title, and claim which the said state of South Carolina had to the govern-ment, sovereignty, and jurisdiction in and over the same, and also the right and pre-emption of soil from the native Indians, and all the estate, property, and claim which the said state of South Carolina had in or to the said lands.

And the jury further find, that the land described in the plaintiff's declaration is situate south-west of the boundary line last aforesaid; and that the same land lies within the limits of the territory granted to the said lords proprietors of Carolina, by King Charles the second, as aforesaid, and within the bounds of the territory agreed to belong and ceded to the King of Great Britain, by the said treaty of peace made in seventeen hundred and sixty-three, as aforesaid; and within the bounds of the United States, as agreed and settled by the treaty of peace in seventeen hundred and eighty-three, as aforesaid; and north of a line drawn due east from the mouth of the said river Yazoos, where it unites with the Mississippi aforesaid. That afterwards, on the ninth day of August, in the year of our lord one thousand seven hundred and eighty-seven, the delegates of said state of South Carolina in congress moved, that the said convention, made as aforesaid, be ratified and confirmed, and that the lines and limits therein specified be thereafter taken and received as the boundaries between the said states of South Carolina and Georgia; which motion was by the unanimous vote of congress committed, and the same convention was thereupon entered of record on the journals of congress; and on the same day John Kean and Daniel Huger, by virtue of authority given to them by the legislature of said state of South Carolina, did execute a deed of cession on the part of said state of South Carolina, by which they ceded and conveyed to the United States, in congress assembled, for the benefit of all the said states, all their right and title to that territory and tract of land included within the river Mississippi, and a line beginning at that part of the said river which is intersected by the southern boundary line of the state of North Carolina; and continuing along the said boundary line, until it intersects the ridge or chain of mountains which divides the eastern from the western waters; then to be continued along the top of the said ridge of mountains, until it intersects a line to be drawn due west from the head of the southern branch of the Tugaloo river to the said mountains, and thence to run a due west course to the river Mississippi; which deed of cession was

FLETCHER
v.
PECK.

thereupon received and entered on the journals of congress, and accepted by them.

The jury further find, that the congress of the United States did, on the sixth day of September, in the year of our lord one thousand, seven hundred and eighty, recommend to the several states in the union having claims to western territory, to make a liberal cession to the United States of a portion of their respective claims for the common benefit of the union.    That afterwards, on the ninth day of August, in the year of our lord one thousand seven hundred and eighty-six, the said congress resolved, that whereas the states of Massachusetts, New-York, Connecticut, and Virginia had, in consequence of the recommendation of congress on the sixth day of September aforesaid, made cessions of their claims to western territory to the United States in congress assembled, for the use of the United States, the said subject be again presented to the view of the states of N. Carolina, S. Carolina and Georgia, who had not complied with so reasonable a proposition ; and that they be once more solicited to consider with candour and liberality the expectations of their sister states, and the earnest and repeated applications made to them by congress on this subject.    That afterwards, on the twentieth day of October, one thousand seven hundred and eighty-seven, the congress of the United States passed the following resolve, viz. that it be and hereby is represented to the states of North-Carolina and Georgia, that the lands, which have been ceded by the other states in compliance with the recommendation of this body, are now selling in large quantities for public securities ; that the deeds of cession from the different states have been made without annexing an express condition, that they should not operate till the other states, under like circumstances, made similar cessions ; and that congress have such faith in the justice and magnanimity of the states of North Carolina and Georgia, that they only think it necessary to call their attention to these circumstances, not doubting but, upon consideration of the subject, they will feel those obligations which will induce similar cessions, and justify that confidence which has been

placed in them. That afterwards, on the first day of February, one thousand seven hundred and eighty-eight, the legislature of said state of Georgia, then duly convened, passed an act for ceding part of the territorial claims of said state to the United States; by which act the state of Georgia authorized her delegates in congress to convey to the United States the territorial claims of said state of Georgia to a certain tract of country bounded as follows, to wit: beginning at the middle of the river Catahouchee or Apalachicola, where it is intersected by the thirty-first degree of north latitude, and from thence due north one hundred and forty miles, thence due west to the river Mississippi; thence down the middle of the said river to where it intersects the thirty-first degree of north latitude, and along the said degree to the place of beginning; annexing the provisions and conditions following, to wit: That the United States in congress assembled, shall guaranty to the citizens of said territory a republican form of government, subject only to such changes as may take place in the federal constitution of the United States; secondly, that the navigation of all the waters included in the said cession shall be equally free to all the citizens of the United States; nor shall any tonnage on vessels, or any duties whatever, be laid on any goods, wares, or merchandises that pass up or down the said waters, unless for the use and benefit of the United States. Thirdly, that the sum of one hundred and and seventy-one thousand and twenty-eight dollars, forty-five cents, which has been expended in quieting the minds of the Indians, and resisting their hostilities, shall be allowed as a charge against the United States, and be admitted in payment of the specie requisition of that state's quotas that have been or may be required by the United States. Fourthly, that in all cases where the state may require defence, the expenses arising thereon shall be allowed as a charge against the United States, agreeably to the articles of confederation. Fifthly, that congress shall guaranty and secure all the remaining territorial rights of the state, as pointed out and expressed by the definitive treaty of peace between the United States and Great Britain, the convention between the said

state and the state of South Carolina, entered into the twenty-eighth day of April, in the year of our lord one thousand seven hundred and eighty-seven, and the clause of an act of the said state of Georgia, describing the boundaries thereof, passed the seventeenth day of February, in the year one thousand seven hundred and eighty-three, which act of the said state of Georgia, with said conditions annexed, was by the delegates of said state in congress presented to the said congress, and the same was, after being read, committed to a committee of congress; who, on the fifteenth day of July, in the said year one thousand seven hundred and eighty-eight, made report thereon to congress, as follows, to wit: "The committee, having fully considered the subject referred to them, are of opinion, that the cession offered by the state of Georgia cannot be accepted on the terms proposed; first, because it appears highly probable that on running the boundary line between that state and the adjoining state or states, a claim to a large tract of country extending to the Mississippi, and lying between the tract proposed to be ceded, and that lately ceded by South Carolina, will be retained by the said state of Georgia; and therefore the land which the state now offers to cede must be too far removed from the other lands hitherto ceded to the union to be of any immediate advantages to it. Secondly, because there appears to be due from the state of Georgia, on specie requisitions, but a small part of the sum mentioned in the third proviso or condition before recited; and it is improper in this case to allow a charge against the specie requisitions of congress which may hereafter be made, especially as the said state stands charged to the United States for very considerable sums of money loaned. And, thirdly, because the fifth proviso or condition before recited contains a special guaranty of territorial rights, and such a guaranty has not been made by congress to any state, and which, considering the spirit and meaning of the confederation, must be unnecessary and improper. But the committee are of opinion, that the first, second, and fourth provisions, before recited, and also the third, with some variations, may be admitted; and that, should the said state extend the bounds of her cession,

and vary the terms thereof as herein after mentioned, congress may accept the same. Whereupon they submit the following resolutions: That the cession of claims to western' territory, offered by the state of Georgia, cannot be accepted on the terms contained in her act passed the first of February last. That in case the said state shall authorize her delegates in congress to make a cession of all her territorial claims to lands west of the river Apalachicola, or west of a meridian line running through or near the point where that river intersects the thirty-first degree of north latitude, and shall omit the last proviso in her said act, and shall so far vary the proviso respecting the sum of one hundred and seventy-one thousand four hundred and twenty-eight dollars, and forty-five cents, expended in quieting and resisting the Indians, as that the said state shall have credit in the specie requisitions of congress, to the amount of her specie quotas on the past requisitions, and for the residue, in her account with the United States for moneys loaned, congress will accept the cession." Which report being read, congress resolved, that congress agree to the said report.

The jury further find, that in the year of our lord one thousand seven hundred and ninety-three, Thomas Jefferson, Esq. then secretary of state for the United States, made a report to the then President of the United States, which was intended to serve as a basis of instructions to the commissioners of the United States for settling the points which were then in dispute between the King of Spain and the government of the United States; one of which points in dispute was, the just boundaries between West Florida and the southern line of the United States. On this point, the said secretary of state, in his report aforesaid, expresses himself as follows, to wit: " As to boundary, that between Georgia and West Florida is the only one which needs any explanation. It (that is, the court of Spain) sets up a claim to possessions within the state of Georgia, founded on her (Spain) having rescued them by force from the British during the late war. The following view of that subject seems to admit of no reply. The several states now composing the Uni-

ted States of America were, from their first establishment, separate and distinct societies, dependent on no other society of men whatever. They continued at the head of their respective governments the executive magistrate who presided over the one they had left, and thereby secured in effect a constant amity with the nation. In this stage of their government their several boundaries were fixed, and particularly the southern boundary of Georgia, the only one now in question, was established at the thirty-first degree of latitude, from the Apalachicola westwardly. The southern limits of Georgia depend chiefly on, first, the charter of South Carolina, &c. Secondly, on the proclamation of the British king, in one thousand seven hundred and sixty-three, establishing the boundary between Georgia and Florida, to begin on the Mississippi, in thirty-one degrees of north latitude, and running eastwardly to the Apalachicola, &c. That afterwards, on the seventh day of December, of the same year, the commissioners of the United States for settling the aforesaid disputes, in their communications with those of the King of Spain, express themselves as follows, to wit : ' In this stage of their (meaning the United States) government, the several boundaries were fixed, and particularly the southern boundary of Georgia, the one now brought into question by Spain. This boundary was fixed by the proclamation of the King of Great Britain, their chief magistrate, in the year one thousand seven hundred and sixty-three, at a time when no other power pretended any claim whatever to any part of the country through which it run. The boundary of Georgia was thus established: to begin in the Missisippi, in latitude thirty-one north, and running eastward to the Apalachicola,' &c. From what has been said, it results, first, that the boundary of Georgia, now forming the southern limits of the United States, was lawfully established in the year seventeen hundred and sixty-three. Secondly, that it has been confirmed by the only power that could at any time have pretensions to contest it."

That afterwards, on the tenth day of August, in the year 1795, Thomas Pinckney, Esq. minister plenipo-

tentiary of the United States at the court of Spain, in
a communication to the prince of peace, prime minis-
ter of Spain, agreeably to his instructions from the
President of the United States on the subject of said
boundaries, expresses himself as follows, to wit:
" Thirty-two years have elapsed since all the country
on the left or eastern bank of the Mississippi, being
under the legitimate jurisdiction of the King of En-
gland, that sovereign thought proper to regulate with
precision the limits of Georgia and the two Floridas,
which was done by his solemn proclamation, published
in the usual form; by which he established between
them precisely the same limits that, near twenty years
after, he declared to be the southern limits of the
United States, by the treaty which the same King of
England concluded with them, in the month of Novem-
ber, seventeen hundred and eighty-two."

That afterwards, on the 27th day of October, in the
year seventeen hundred and ninety-five, a treaty of
friendship, limits and navigation was concluded be-
tween the United States and his catholic majesty the
King of Spain; in the second article of which treaty it
is agreed, that the southern boundary of the United
States, which divides their territory from the Spanish
colonies of East and West Florida, shall be designated
by a line beginning on the river Mississippi, at the north-
ernmost part of the thirty-first degree of north latitude,
which from thence shall be drawn due east to the mid-
dle of the river Apalachicola or Catahouchee, thence
along the middle thereof to its junction with the
Flint, thence straight to the head of St. Mary's river,
and thence down the middle thereof to the Atlantic
ocean."

But whether, upon the whole matter, the state of
Georgia, at the time of passing the act aforesaid, enti-
tled as aforesaid, as mentioned by the plaintiff, in his
assignment of the breach in the fourth count of his
declaration, was seised in fee-simple of all the territo-
ries and tenements aforesaid, and of all the soil thereof,
subject only to the extinguishment of the Indian title

FLETCHER
v.
PECK.

to part thereof, the jury are ignorant, and pray the ad
visement of the court thereon; and if the court are' of
opinion, that the said state of Georgia was so seised
at the time aforesaid, then the jury find, that the said
state of Georgia, at the time of passing the act afore-
said, entitled as aforesaid, as mentioned by the said
Fletcher, in his assignment of the breach in the fourth
coun of his declaration, was seised in fee-simple of
all the territories and tenements aforesaid, and of all
the soil thereof, subject only to the extinguishment of
the Indian title to part thereof, and the jury thereupon
find, that the said Peck his covenant aforesaid, the
breach whereof is assigned in the plaintiff's fourth
count mentioned, hath not broken, but hath kept the
same.

But if the court are of opinion that the said state of
Georgia was not so seised at the time aforesaid, then
the jury find, that the said state of Georgia, at the
time of passing the act aforesaid, entitled as aforesaid,
as mentioned by the said Fletcher, in his assignment of
the breach in the fourth count of his declaration, was
not seised of all the territories and tenements afore-
said, and of all the soil thereof, subject only to the ex-
tinguishment of the Indian title to part thereof; and
the jury thereupon find, that the said Peck his
covenant aforesaid, the breach whereof is assigned in
the plaintiff's fourth count mentioned, hath not kept,
but broken the same; and assess damages for the
plaintiff, for the breach thereof, in the sum of three
thousand dollars, and costs of suit.

Whereupon it was considered and adjudged by the
court below, that on the issues on the three first counts,
the several pleas are good and sufficient, and that the
demurrer thereto be overruled; and on the last issue,
on which there is a special verdict, that the state of
Georgia was seised, as alleged by the defendant, and
that the defendant recover his costs.

The plaintiff sued out his writ of error, and the case
was twice argued, first by *Martin*, for the plaintiff in
error; and by *J. Q. Adams*, and *R. G. Harper*, for the

defendant, at February term, 1809, and again at this term by *Martin*, for the plaintiff, and by *Harper* and *Story*, for the defendant.

FLETCHER
v.
PECK.

*Martin*, for the plaintiff in error.

The first plea is no answer to the first count. The breach of the covenant complained of is, that " the *legislature had no authority to sell and dispose of*" the land, but the plea is, that " *the said Matthews, governor of the said state*, was fully and legally empowered to *sell and convey*" the land. Although the *governor* had authority to sell, *non constat* that the *legislature* had.

The same objection applies to the second plea ; it is an answer to the inducement, not to the point of the plea. The breach assigned in the second count is, " that the title which the state of Georgia at any time had in the premises was never legally conveyed to the said Peck by force of the conveyances aforesaid."

The improper influence upon the members of the legislature was only inducement.

The plea is, the defendant had no notice nor knowledge of the improper means used. It is no answer to the breach assigned.

The same objection applies also to the third plea.

It appears upon the special verdict that the state of Georgia never was seised in fee of the lands. They belonged to the crown of Great Britain, and at the revolution devolved upon the United States, and not upon the state of Georgia.

When the colonies of North Carolina and South Carolina were royal colonies, the king limited the boundaries, and disannexed these lands from Georgia.

Argument for the defendant in error.

The first fault of pleading is in the declaration.

FLETCHER
v.
PECK.

The breach of the covenant is not well assigned in the first count. The covenant is, that the legislature had good *right* to sell. The breach assigned is, that the legislature had no *authority* to sell. Authority and right, are words of a different signification. Right implies an interest : authority is a mere naked power.

But if the breach be well assigned, the plea is a substantial answer to it, for if the governor derived full power and authority from the legislature to sell, the legislature must have had that power to give. The plea shows the title to be in the state of Georgia.

The objection is only to the form of the plea, which cannot prevail upon a general demurrer.

Two questions arise upon the issue joined upon the 4th plea.

1st. Whether the title was in the state of Georgia ; and, 2d. Whether it was in the United States.

At the beginning of the revolution the lands were within the bounds of Georgia. These bounds were confirmed by the treaty of peace in 1783, and recognised in the treaty with Spain in 1795, and by the cession to the United States in 1802.

The United States can have no title but what is derived from Georgia.

The title of Georgia depends upon the facts found in the special verdict.

The second charter granted by George the 2d in 1732, includes these lands, the bounds of that grant being from the Savannah to the Alatamaha, and from the heads of those rivers respectively, in direct lines, to the South Sea.

It is not admitted that the king had a right to enlarge or diminish the boundaries even of royal provinces.

The exercise of that right, even by parliament itself, was one of the violations of right upon which the revolution was founded; as appears by the declaration of independence, the address to the people of Quebec, and other public documents of the time.

. This right, claimed by the king, was denied by Virginia and North Carolina in their constitutions. See the article of the *constitution of Virginia* respecting the limits of that state, and the *25th section of the declaration of rights of North Carolina.* 1 *Belsham's Hist. of Geo. 3d. The Quebec Act,* and the *Collection of State Constitutions, p.* 180.

The right was denied by the commissioners on the part of the United States, who formed the treaty, and was given up by Great Britain when the present line was established.

But the proclamation of 1763 did not profess or intend to disannex the western lands from the province of Georgia. The king only declares that it is his royal will and pleasure *for the present,* "*as aforesaid,*" to reserve under his sovereignty, *protection and dominion, for the use* of the Indians, all the lands and territories lying to the westward of the sources of the rivers which fall into the sea from the west and north-west; and he thereby forbids his subjects from making purchases or settlements, or taking possession of the same.

This clause of the proclamation cannot well be understood without the preceding section to which it refers, by the words "*as aforesaid.*"

The preceding clause is, " that no governor or commander in chief of our other colonies or plantations in America, *i. e.* (other than the colonies of Quebec, East Florida and West Florida,) do presume for the present *and until our further pleasure be known,* to grant warrants of surveys, or pass patents for any lands beyond the heads or sources of any of the rivers, which fall into the Atlantic ocean from the west or north-west; or upon any lands whatever which, not having been

ceded to, or purchased by us, as aforesaid, are reserved to the said Indians, or any of them."

Then comes the clause in question, which is supposed to have disannexed these lands from Georgia, as follows: " And we do further declare it to be our royal will and pleasure for the present as aforesaid, to reserve under our sovereignty, protection and dominion, for the use of the said Indians, all the land and territories lying to the westward of the sources of the rivers which fall into the sea from the west and north-west as aforesaid," &c.

It was a prohibition to *all* the governors of *all* the colonies, and a reservation of *all* the western lands attached to *all* the colonies. But it was only a temporary reservation for the use of the Indians.

If this proclamation disannexed these lands from Georgia, it also disannexed all the western lands from all the other colonies. But if they were disannexed by the proclamation, they were reannexed three months afterwards by the commission to Governor Wright, on the 20th of January, 1764.

It appears by the report of the attorney-general, as well as by Mr. Chalmers's observations, that it never was the opinion of the British government that these lands were disannexed by the proclamation.

If they were not reannexed before, they certainly were by the treaty of peace.

At the commencement of the revolution, the lands then belonged to and formed a part of the province of Georgia.

By the declaration of independence the several states were declared to be free, sovereign and independent states; and the sovereignty of *each*, not of the whole, was the principle of the revolution; there was no connection between them, but that of necessity and self defence, and in what manner each should contribute to the

common cause, was a matter left to the discretion of each of the states. By the second article of the confederation the sovereignty of each state is confirmed, and all the rights of sovereignty are declared to be retained which are not by that instrument expressly delegated to the United States in congress assembled. It provides also that no state shall be deprived of territory for the benefit of the United States.

On the 25th of February, 1783, the legislature of Georgia passed an act declaring her boundaries, before the definitive treaty of peace. This declaration of Georgia was not contradicted by the United States in any public act.

In 1785, Georgia passed an act erecting the county of Bourbon in that territory ; this produced a dispute with South Carolina, which ended in the acknowledgment of the right of Georgia to these lands. (See the third article of the convention between South Carolina and Georgia.)

The same boundaries are acknowledged by the United States in their instructions, given by the secretary of state, Mr. Jefferson, in 1793, to the commissioners appointed to settle the dispute with Spain respecting boundaries.

The United States certainly had no claim at the commencement of the revolution, nor at the declaration of independence, nor under the articles of confederation.

During the progress of the revolution a demand was made by two or three of the states, that crown lands should be appropriated for the common defence. But congress never asserted such a right. They only recommended that *cessions* of territory should be made by the states for that purpose.

The journals of congress are crowded with proofs of this fact. See journals of congress, 16*th September*, 1776, *vol.* 2. *p.* 336. 30*th of October*, 1776. 15*th*

FLETCHER
v
PECK.

*October, 1777, vol. 3. p. 345. 27th October, 1777, vol. 3. p. 363. 22d June, 1778, vol. 4. p. 262. 23d and 25th June, 1778. p, 269. 1779, vol. 5. p. 49. 21st May, 1779, vol. 5. p. 158. 1st March, 1781. Resolution of 1780, vol. 6. p. 123. 12th February, 1781, vol. 7. p. 26. 1st March, 1781. 29th October, 1782, vol. 8. p. ——.*

At the treaty of peace, there was no idea of a cession of land to the United States, by Great Britain. The bounds of the United States were fixed as the bounds of the several states had been before fixed. The United States did not claim land for the United States as a nation; they claimed only in right of the individual states. Great Britain yielded the principle of the royal right to disannex lands from the colonies, and acquiesced in the principle contended for by the United States, which was the old boundary of the several states. See Chief Justice Jay's opinion in the case of *Chisholm* v. *The State of Georgia*, reported in a pamphlet published in 1793.

The United States then had no title by the treaty of peace. She has since (viz. in 1788) declined accepting a cession of the territory from Georgia, not because the United States had already a title, but because the lands were too remote, &c.

There is nothing in the constitution of the United States, which can give her a title. By the third section of the fourth article the claims of particular states are saved.

The public acts since the adoption of the new constitution are the instructions to the commissioners in 1793, to settle the boundaries with Spain. The treaty with Spain, 27th October, 1795. The act of congress of 7th April, 1798, vol. 4. p. 90. The act of 10th of May, 1800. The remonstrance of Georgia, in December, 1800. And the cession by Georgia to the United States in 1802. All these public acts recognised the title to be in Georgia.

If then Georgia had good title on the 7th of January, 1795, the next question is, had the legislature of that state a right to sell?

By the revolution, all the right and royal prerogatives devolved upon the people of the several states, to be exercised in such manner as they should prescribe, and by such governments as they should erect. The right of disposing of the lands belonging to the state naturally devolved upon the legislative body; who were to enact such laws as should authorize the sale and conveyance of them. The sale itself was not a legislative act. It was not an act of sovereignty, but a mere conveyance of title. 2 *Tucker's Bl. Com.* 53. 57. *Montesquieu, b.* 26. *c.* 16. 2 *Dal.* 320. 4 *Dal.* 14. *Cooper v. Telfaire.* Constitution of Georgia, Art. 1. § 16. Digest of Georgia Laws of 7th June, 1777, 1780, 1784, 1785, 1788, 1789, and 1790. These show the universal practice of Georgia in this respect.

A doubt has been suggested whether this power extends to lands to which the Indian title has not been extinguished.

What is the Indian title? It is a mere occupancy for the purpose of hunting. It is not like our tenures; they have no idea of a title to the soil itself. It is overrun by them, rather than inhabited. It is not a true and legal possession. *Vattel, b.* 1. § 81. *p.* 37. and § 209. *b.* 2. § 97. *Montesquieu, b.* 18. *c.* 12. *Smith's Wealth of Nations, b.* 5. *c.* 1. It is a right not to be *transferred* but *extinguished.* It a right regulated by treaties, not by deeds of conveyance. It depends upon the law of nations, not upon municipal right.

Although the power to extinguish this right by treaty, is vested in congress, yet Georgia had a right to sell subject to the Indian claim. The point has never been decided in the courts of the United States; because it has never before been questioned.

The right has been exercised and recognised by all the states.

There was no objection to the sale arising from the constitution of Georgia. With regard to *state* constitutions, it is not necessary that the powers should be *expressly* granted, however it may be with the constitution of the United States. But it is not constitutional doctrine even as it applies to the legislature of the United States.

The old articles of confederation limited the powers of congress to those *expressly* granted. But in the constitution of the United States, the word *expressly* was purposely rejected. *See the Federalist, and Journals of House of Rep.* 21st August, 1789. *Journal of Senate*, 7th September, 1789.

But if the legislature of Georgia could only exercise powers *expressly* given they had no power to abrogate the contract.

A question has been suggested from the bench whether the right which Georgia had before the extinguishment of the Indian title, is such a right as is susceptible of conveyance, and whether it can be said to be a title in fee-simple?

The Europeans found the territory in possession of a rude and uncivilized people, consisting of separate and independent nations. They had no idea of property in the soil but a right of occupation. A right not individual but national. This is the right gained by conquest. The Europeans always claimed and exercised the right of conquest over the soil. They allowed the former occupants a part, and took to themselves what was not wanted by the natives. Even *Penn* claimed under the right of conquest. He took under a charter from the King of England, whose right was the right of conquest. Hence the feudal tenures in this country. All the treaties with the Indians were the effect of conquest. All the extensive grants have been forced from them by successful war. The conquerors permitted the conquered tribes to occupy part of the land until it should be wanted for the use of the conquerors. Hence the acts of legislation

fixing the lines and bounds of the Indian claims; FLETCHER
hence the prohibition of individual purchasers, &c.

v.

PECK.

The rights of governments are allodial. The crown of
Great Britain granted lands to individuals, even while
the Indian claim existed, and there has never been a
question respecting the validity of such grants. When
that claim was extinguished, the grantee was always
admitted to have acquired a complete title. The In-
dian title is a mere privilege which does not affect the
allodial right.

The legislature of Georgia could not revoke a grant
once executed. It had no right to declare the law
void; that is the exercise of a judicial, not a legislative
function. It is the province of the judiciary to say
what the law *is*, or what it *was*. The legislature can
only say what it *shall be*.

The legislature was forbidden by the constitution of
the United States to pass any law impairing the obliga-
tion of contract. A grant is a contract executed, and
it creates also an implied *executory* contract, which is,
that the grantee shall continue to enjoy the thing grant-
ed according to the terms of the grant.

The validity of a law cannot be questioned because
undue influence may have been used in obtaining it.
However improper it may be, and however severely
the offenders may be punished, if guilty of bribery,
yet the grossest corruption will not authorize a judi-
cial tribunal in disregarding the law.

This would open a source of litigation which could
never be closed. The law would be differently deci-
ded by different juries; innumerable perjuries would
be committed, and inconceivable confusion would en-
sue.

But the parties now before the court are innocent
of the fraud, if any has been practised. They were
*bona fide* purchasers, for a valuable consideration, with-
out notice of fraud. They cannot be affected by it.

FLETCHER
v
PECK.

*Martin*, in reply.

All the western lands of the royal governments were wholly disannexed from the colonies, and reserved for the use of the Indians. Georgia never had title in those lands. It is true that Great Britain did undertake to extend the bounds of the royal provinces. The right was not denied, but the *purpose* for which it was executed.

By the proclamation, if offenders should escape into those territories, they are to be arrested by the military force and sent *into the colony* for trial.

In Governor Wright's commission the western boundary of the colony is not defined. The jury has not found whether the lands were within Governor Wright's commission.

As to the Indian title.

The royal provinces were not bodies politic for the purpose of holding lands. The title of the lands was in the crown. There is no law authorizing the several states to transfer their right subject to the Indian title. It was only a right of pre-emption which the crown had. This right was not by the treaty ceded to Georgia, but to the United States. The land when purchased of the Indians is to be purchased for the benefit of the United States. There was only a possibility that the United States would purchase for the benefit of Georgia. But a mere possibility cannot be sold or granted.

The declarations and claims of Georgia could not affect the rights of the United States.

An attempt was made in congress to establish the principle that the land belonged to the United States; but the advocates of that doctrine were overruled by a majority. This, however, did not decide the question of right.

The states which advocated that principle did not think proper to refuse to join the confederacy because it was not inserted among the article s of confederation, but they protested against their assent to the union being taken as evidence of their abandonment of the principle.

Nor is the assent of congress to the commission for settling the bounds between South Carolina and Georgia, evidence of an acknowledgment, on the part of the United States, that either of those states was entitled to those lands.

*March* 11, 180𝓨.

MARSHALL, Ch. J. delivered the opinion of the court upon the pleadings, as follows:

In this cause there are demurrers to three pleas filed in the circuit court, and a special verdict found on an issue joined on the 4th plea. The pleas were all sustained, and judgment was rendered for the defendant.

To support this judgment, this court must concur in overruling all the demurrers; for, if the plea to any one of the counts be bad, the plaintiff below is entitled to damages on that count.

The covenant, on which the breach in the first count is assigned, is in these words; "that the legislature of the said state, (Georgia,) at the time of the passing of the act of sale aforesaid, had good right to sell and dispose of the same, in manner pointed out by the said act."

The breach of this covenant is assigned in these words; "now the said Fletcher saith that, at the time when the said act of the legislature of Georgia, entitled an act, &c. was passed, the said legislature had no authority to sell and dispose of the tenements aforesaid, or of any part thereof, in the manner pointed out in the said act."

The plea sets forth the constitution of the state of Georgia, and avers that the lands lay within that state. It then sets forth the act of the legislature, and avers that the lands, described in the declaration, are included within those to be sold by the said act; and that the governor was legally empowered to sell and convey the premises.

To this plea the plaintiff demurred; and the defendant joined in the demurrer.

If it be admitted that sufficient matter is shown, in this plea, to have justified the defendant in denying the breach alleged in the count, it must also be admitted that he has not denied it. The breach alleged is, that the legislature had not authority to sell. The bar set up is, that the governor had authority to convey. Certainly an allegation, that the principal has no right to give a power, is not denied by alleging that he has given a proper power to the agent.

It is argued that the plea shows, although it does not, in terms, aver, that the legislature had authority to convey. The court does not mean to controvert this position, but its admission would not help the case. The matter set forth in the plea, as matter of inducement, may be argumentatively good, may warrant an averment which negatives the averment in the declaration, but does not itself constitute that negative.

Had the plaintiff tendered an issue in fact upon this plea, that the governor was legally empowered to sell and convey the premises, it would have been a departure from his declaration; for the count to which this plea is intended as a bar alleges no want of authority in the governor. He was therefore under the necessity of demurring.

But it is contended that although the plea be substantially bad, the judgment, overruling the demurrer, is correct, because the declaration is defective.

The defect alleged in the declaration is, that the
6

breach is not assigned in the words of the covenant. The covenant is, that the legislature had a *right* to convey, and the breach is, that the legislature had no *authority* to convey.

It is not necessary that a breach should be assigned in the very words of the covenant. It is enough that the words of the assignment show, unequivocally, a substantial breach. The assignment under consideration does show such a breach. If the legislature had no *authority* to convey, it had no *right* to convey.

It is, therefore, the opinion of this court, that the circuit court erred in overruling the demurrer to the first plea by the defendant pleaded, and that their judgment ought therefore to be reversed, and that judgment on that plea be rendered for the plaintiff.

After the opinion of the court was delivered, the parties agreed to amend the pleadings, and the cause was continued for further consideration.

The cause having been again argued at this term,

*March* 16, 1810,

MARSHALL, Ch. J. delivered the opinion of the court as follows :

The pleadings being now amended, this cause comes on again to be heard on sundry demurrers, and on a special verdict.

The suit was instituted on several covenants contained in a deed made by John Peck, the defendant in error, conveying to Robert Fletcher, the plaintiff in error, certain lands which were part of a large purchase made by James Gunn and others, in the year 1795, from the state of Georgia, the contract for which was made in the form of a bill passed by the legislature of that state.

The first count in the declaration set forth a breach

in. the second covenant contained in the deed. The covenant is, " that the legislature of the state of Georgia, at the time of passing the act of sale aforesaid, had good right to sell and dispose of the same in manner pointed out by the said act." The breach assigned is, that the legislature had no power to sell.

The plea in bar sets forth the constitution of the state of Georgia, and avers that the lands sold by the defendant to the plaintiff, were within that state. It then sets forth the granting act, and avers the power of the legislature to sell and dispose of the premises as pointed out by the act.

To this plea the plaintiff below demurred, and the defendant joined in demurrer.

That the legislature of Georgia, unless restrained by its own constitution, possesses the power of disposing of the unappropriated lands within its own limits, in such manner as its own judgment shall dictate, is a proposition not to be controverted. The only question, then, presented by this demurrer, for the consideration of the court, is this, did the then constitution of the state of Georgia prohibit the legislature to dispose of the lands, which were the subject of this contract, in the manner stipulated by the contract ?.

The question, whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.

In this case the court can perceive no such opposition. In the constitution of Georgia, adopted in the

year 1789, the court can perceive no restriction on the legislative power, which inhibits the passage of the act of 1795. The court cannot say that, in passing that act, the legislature has transcended its powers, and violated the constitution.

In overruling the demurrer, therefore, to the first plea, the circuit court committed no error.

The 3d covenant is, that all the title which the state of Georgia ever had in the premises had been legally conveyed to John Peck, the grantor.

The 2d count assigns, in substance, as a breach of this covenant, that the original grantees from the state of Georgia promised and assured divers members of the legislature, then sitting in general assembly, that if the said members would assent to, and vote for, the passing of the act, and if the said bill should pass, such members should have a share of, and be interested in, all the lands purchased from the said state by virtue of such law. And that divers of the said members, to whom the said promises were made, were unduly influenced thereby, and, under such influence, did vote for the passing of the said bill; by reason whereof the said law was a nullity, &c. and so the title of the state of Georgia did not pass to the said Peck, &c.

The plea to this count, after protesting that the promises it alleges were not made, avers, that until after the purchase made from the original grantees by James Greenleaf, under whom the said Peck claims, neither the said James Greenleaf, nor the said Peck, nor any of the mesne vendors between the said Greenleaf and Peck, had any notice or knowledge that any such promises or assurances were made by the said original grantees, or either of them, to any of the members of the legislature of the state of Georgia.

To this plea the plaintiff demurred generally, and the defendant joined in the demurrer.

FLETCHER
v.
PECK.

That corruption should find its way into the governments of our infant republics, and contaminate the very source of legislation, or that impure motives should contribute to the passage of a law, or the formation of a legislative contract, are circumstances most deeply to be deplored. How far a court of justice would, in any case, be competent, on proceedings instituted by the state itself, to vacate a contract thus formed, and to annul rights acquired, under that contract, by third persons having no notice of the improper means by which it was obtained, is a question which the court would approach with much circumspection. It may well be doubted how far the validity of a law depends upon the motives of its framers, and how far the particular inducements, operating on members of the supreme sovereign power of a state, to the formation of a contract by that power, are examinable in a court of justice. If the principle be conceded, that an act of the supreme sovereign power might be declared null by a court, in consequence of the means which procured it, still would there be much difficulty in saying to what extent those means must be applied to produce this effect. Must it be direct corruption, or would interest or undue influence of any kind be sufficient? Must the vitiating cause operate on a majority, or on what number of the members? Would the act be null, whatever might be the wish of the nation, or would its obligation or nullity depend upon the public sentiment?

If the majority of the legislature be corrupted, it may well be doubted, whether it be within the province of the judiciary to control their conduct, and, if less than a majority act from impure motives, the principle by which judicial interference would be regulated, is not clearly discerned.

Whatever difficulties this subject might present, when viewed under aspects of which it may be susceptible, this court can perceive none in the particular pleadings now under consideration.

This is not a bill brought by the state of Georgia, to annul the contract, nor does it appear to the court, by

this count, that the state of Georgia is dissatisfied with the sale that has been made. The case, as made out in the pleadings, is simply this. One individual who holds lands in the state of Georgia, under a deed covenanting that the title of Georgia was in the grantor, brings an action of covenant upon this deed, and assigns, as a breach, that some of the members of the legislature were induced to vote in favour of the law, which constituted the contract, by being promised an interest in it, and that therefore the act is a mere nullity.

This solemn question cannot be brought thus collaterally and incidentally before the court. It would be indecent, in the extreme, upon a private contract, between two individuals, to enter into an inquiry respecting the corruption of the sovereign power of a state. If the title be plainly deduced from a legislative act, which the legislature might constitutionally pass, if the act be clothed with all the requisite forms of a law, a court, sitting as a court of law, cannot sustain a suit brought by one individual against another founded on the allegation that the act is a nullity, in consequence of the impure motives which influenced certain members of the legislature which passed the law.

The circuit court, therefore, did right in overruling this demurrer.

The 4th covenant in the deed is, that the title to the premises has been, in no way, constitutionally or legally impaired by virtue of any subsequent act of any subsequent legislature of the state of Georgia.

The third count recites the undue means practised on certain members of the legislature, as stated in the second count, and then alleges that, in consequence of these practices, and of other causes, a subsequent legislature passed an act annulling and rescinding the law under which the conveyance to the original grantees was made, declaring that conveyance void, and asserting the title of the state to the lands it contained. The

FLETCHER
v.
PECK.

count proceeds to recite at large, this rescinding act, and concludes with averring that, by reason of this act, the title of the said Peck in the premises was constitutionally and legally impaired, and rendered null and void.

After protesting, as before, that no such promises were made as stated in this count, the defendant again pleads that himself and the first purchaser under the original grantees, and all intermediate holders of the property, were purchasers without notice.

To this plea there is a demurrer and joinder,

The importance and the difficulty of the questions, presented by these pleadings, are deeply felt by the court.

The lands in controversy vested absolutely in James Gunn and others, the original grantees, by the conveyance of the governor, made in pursuance of an act of assembly to which the legislature was fully competent. Being thus in full possession of the legal estate, they, for a valuable consideration, conveyed portions of the land to those who were willing to purchase. If the original transaction was infected with fraud, these purchasers did not participate in it, and had no notice of it. They were innocent. Yet the legislature of Georgia has involved them in the fate of the first parties to the transaction, and, if the act be valid, has annihilated their rights also.

The legislature of Georgia was a party to this transaction; and for a party to pronounce its own deed invalid, whatever cause may be assigned for its invalidity, must be considered as a mere act of power which must find its vindication in a train of reasoning not often heard in courts of justice.

But the real party, it is said, are the people, and when their agents are unfaithful, the acts of those agents cease to be obligatory.

It is, however, to be recollected that the people can

act only by these agents, and that, while within the powers conferred on them, their acts must be considered as the acts of the people. If the agents be corrupt, others may be chosen, and, if their contracts be examinable, the common sentiment, as well as common usage of mankind, points out a mode by which this examination may be made, and their validity determined.

If the legislature of Georgia was not bound to submit its pretensions to those tribunals which are established for the security of property, and to decide on human rights, if it might claim to itself the power of judging in its own case, yet there are certain great principles of justice, whose authority is universally acknowledged, that ought not to be entirely disregarded.

If the legislature be its own judge in its own case, it would seem equitable that its decision should be regulated by those rules which would have regulated the decision of a judicial tribunal. The question was, in its nature, a question of title, and the tribunal which decided it was either acting in the character of a court of justice, and performing a duty usually assigned to a court, or it was exerting a mere act of power in which it was controlled only by its own will.

If a suit be brought to set aside a conveyance obtained by fraud, and the fraud be clearly proved, the conveyance will be set aside, as between the parties; but the rights of third persons, who are purchasers without notice, for a valuable consideration, cannot be disregarded. Titles, which, according to every legal test, are perfect, are acquired with that confidence which is inspired by the opinion that the purchaser is safe. If there be any concealed defect, arising from the conduct of those who had held the property long before he acquired it, of which he had no notice, that concealed defect cannot be set up against him. He has paid his money for a title good at law, he is innocent, whatever may be the guilt of others, and equity will not subject him to the penalties attached to that guilt. All titles would be insecure, and the inter-

course between man and man would be very seriously obstructed, if this principle be overturned.

A court of chancery, therefore, had a bill been brought to set aside the conveyance made to James Gunn and others, as being obtained by improper practices with the legislature, whatever might have been its decision as respected the original grantees, would have been bound, by its own rules, and by the clearest principles of equity, to leave unmolested those who were purchasers, without notice, for a valuable consideration.

If the legislature felt itself absolved from those rules of property which are common to all the citizens of the United States, and from those principles of equity which are acknowledged in all our courts, its act is to be supported by its power alone, and the same power may devest any other individual of his lands, if it shall be the will of the legislature so to exert it.

It is not intended to speak with disrespect of the legislature of Georgia, or of its acts. Far from it. The question is a general question, and is treated as one. For although such powerful objections to a legislative grant, as are alleged against this, may not again exist, yet the principle, on which alone this rescinding act is to be supported, may be applied to every case to which it shall be the will of any legislature to apply it. The principle is this; that a legislature may, by its own act, devest the vested estate of any man whatever, for reasons which shall, by itself, be deemed sufficient.

In this case the legislature may have had ample proof that the original grant was obtained by practices which can never be too much reprobated, and which would have justified its abrogation so far as respected those to whom crime was imputable. But the grant, when issued, conveyed an estate in fee-simple to the grantee, clothed with all the solemnities which law can bestow. This estate was transferrable; and those who purchased parts of it were not stained by that

4

guilt which infected the original transaction. Their
case is not distinguishable from the ordinary case of
purchasers of a legal estate without knowledge of any
secret fraud which might have led to the emanation of
the original grant. According to the well known
course of equity, their rights could not be affected by
such fraud. Their situation was the same, their title
was the same, with that of every other member of the
community who holds land by regular conveyances
from the original patentee.

Is the power of the legislature competent to the
annihilation of such title, and to a resumption of the
property thus held?

The principle asserted is, that one legislature is
competent to repeal any act which a former legislature
was competent to pass; and that one legislature cannot
abridge the powers of a succeeding legislature.

The correctness of this principle, so far as respects
general legislation, can never be controverted. But,
if an act be done under a law, a succeeding legislature
cannot undo it. The past cannot be recalled by the
most absolute power. Conveyances have been made,
those conveyances have vested legal estates, and, if
those estates may be seized by the sovereign authority,
still, that they originally vested is a fact, and cannot
cease to be a fact.

When, then, a law is in its nature a contract, when
absolute rights have vested under that contract, a re-
peal of the law cannot devest those rights; and the
act of annulling them, if legitimate, is rendered so by
a power applicable to the case of every individual in
the community.

It may well be doubted whether the nature of so-
ciety and of government does not prescribe some limits
to the legislative power; and, if any be prescribed,
where are they to be found, if the property of an indi-
vidual, fairly and honestly acquired, may be seized
without compensation.

To the legislature all legislative power is granted; but the question, whether the act of transferring the property of an individual to the public, be in the nature of the legislative power, is well worthy of serious reflection.

It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments. How far the power of giving the law may involve every other power, in cases where the constitution is silent, never has been, and perhaps never can be, definitely stated.

The validity of this rescinding act, then, might well be doubted, were Georgia a single sovereign power. But Georgia cannot be viewed as a single, unconnected, sovereign power, on whose legislature no other restrictions are imposed than may be found in its own constitution. She is a part of a large empire; she is a member of the American union; and that union has a constitution the supremacy of which all acknowledge, and which imposes limits to the legislatures of the several states, which none claim a right to pass. The constitution of the United States declares that no state shall pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts.

Does the case now under consideration come within this prohibitory section of the constitution?

In considering this very interesting question, we immediately ask ourselves what is a contract? Is a grant a contract?

A contract is a compact between two or more parties, and is either executory or executed. An executory contract is one in which a party binds himself to do, or not to do, a particular thing; such was the law under which the conveyance was made by the governor. A contract executed is one in which the object

of contract is performed; and this, says Blackstone, differs in nothing from a grant. The contract between Georgia and the purchasers was executed by the grant. A contract executed, as well as one which is executory, contains obligations binding on the parties. A grant, in its own nature, amounts to an extinguishment of the right of the grantor, and implies a contract not to reassert that right. A party is, therefore, always estopped by his own grant.

Since, then, in fact, a grant is a contract executed, the obligation of which still continues, and since the constitution uses the general term contract, without distinguishing between those which are executory and those which are executed, it must be construed to comprehend the latter as well as the former. A law annulling conveyances between individuals, and declaring that the grantors should stand seised of their former estates, notwithstanding those grants, would be as repugnant to the constitution as a law discharging the vendors of property from the obligation of executing their contracts by conveyances. It would be strange if a contract to convey was secured by the constitution, while an absolute conveyance remained unprotected.

If, under a fair construction the constitution, grants are comprehended under the term contracts, is a grant from the state excluded from the operation of the provision? Is the clause to be considered as inhibiting the state from impairing the obligation of contracts between two individuals, but as excluding from that inhibition contracts made with itself?

The words themselves contain no such distinction. They are general, and are applicable to contracts of every description. If contracts made with the state are to be exempted from their operation, the exception must arise from the character of the contracting party, not from the words which are employed.

Whatever respect might have been felt for the state sovereignties, it is not to be disguised that the framers of the constitution viewed, with some appre-

hension, the violent acts which might grow out of the feelings of the moment; and that the people of the United States, in adopting that instrument, have manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed. The restrictions on the legislative power of the states are obviously founded in this sentiment; and the constitution of the United States contains what may be deemed a bill of rights for the people of each state.

No state shall pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts.

A bill of attainder may affect the life of an individual, or may confiscate his property, or may do both.

In this form the power of the legislature over the lives and fortunes of individuals is expressly restrained. What motive, then, for implying, in words which import a general prohibition to impair the obligation of contracts, an exception in favour of the right to impair the obligation of those contracts into which the state may enter?

The state legislatures can pass no *ex post facto* law. An *ex post facto* law is one which renders an act punishable in a manner in which it was not punishable when it was committed. Such a law may inflict penalties on the person, or may inflict pecuniary penalties which swell the public treasury. The legislature is then prohibited from passing a law by which a man's estate, or any part of it, shall be seized for a crime which was not declared, by some previous law, to render him liable to that punishment. Why, then, should violence be done to the natural meaning of words for the purpose of leaving to the legislature the power of seizing, for public use, the estate of an individual in the form of a law annulling the title by which he holds that estate? The court can perceive no sufficient grounds for making this distinction. This rescinding act would have the effect of an *ex post facto* law. It forfeits the estate of Fletcher for a crime not committed by himself, but by those from whom he purchased.

This cannot be effected in the form of an *ex post facto* law, or bill of attainder; why, then, is it allowable in the form of a law annulling the original grant?

The argument in favour of presuming an intention to except a case, not excepted by the words of the constitution, is susceptible of some illustration from a principle originally ingrafted in that instrument, though no longer a part of it. The constitution, as passed, gave the courts of the United States jurisdiction in suits brought against individual states. A state, then, which violated its own contract was suable in the courts of the United States for that violation. Would it have been a defence in such a suit to say that the state had passed a law absolving itself from the contract? It is scarcely to be conceived that such a defence could be set up. And yet, if a state is neither restrained by the general principles of our political institutions, nor by the words of the constitution, from impairing the obligation of its own contracts, such a defence would be a valid one. This feature is no longer found in the constitution; but it aids in the construction of those clauses with which it was originally associated.

It is, then, the unanimous opinion of the court, that, in this case, the estate having passed into the hands of a purchaser for a valuable consideration, without notice, the state of Georgia was restrained, either by general principles which are common to our free institutions, or by the particular provisions of the constitution of the United States, from passing a law whereby the estate of the plaintiff in the premises so purchased could be constitutionally and legally impaired and rendered null and void.

In overruling the demurrer to the 3d plea, therefore, there is no error.

The first covenant in the deed is, that the state of Georgia, at the time of the act of the legislature thereof, entitled as aforesaid, was legally seised in fee of the soil thereof subject only to the extinguishment of part of the Indian title thereon.

The 4th count assigns, as a breach of this covenant, that the right to the soil was in the United States, and not in Georgia.

To this count the defendant pleads, that the state of Georgia *was seised ;* and tenders an issue on the fact in which the plaintiff joins. On this issue a special verdict is found.

The jury find the grant of Carolina by Charles second to the Earl of Clarendon and others, comprehending the whole country from 36 deg. 30 min. north lat. to 29 deg. north lat., and from the Atlantic to the South Sea.

They find that the northern part of this territory was afterwards erected into a separate colony, and that the most northern part of the 35 deg. of north lat. was the boundary line between North and South Carolina.

That seven of the eight proprietors of the Carolinas surrendered to George 2d in the year 1729, who appointed a Governor of South Carolina.

That, in 1732, George the 2d granted, to the Lord Viscount Percival and others, seven eighths of the territory between the Savannah and the Alatamaha, and extending west to the South Sea, and that the remaining eighth part, which was still the property of the heir of Lord Carteret, one of the original grantees of Carolina, was afterwards conveyed to them. This territory was constituted a colony and called Georgia.

That the Governor of South Carolina continued to exercise jurisdiction south of Georgia.

That, in 1752, the grantees surrendered to the crown.

That, in 1754, a governor was appointed by the crown, with a commission describing the boundaries of the colony.

That a treaty of peace was concluded between Great

Britain and Spain, in 1763, in which the latter ceded to the former Florida, with Fort St. Augustin and the bay of Pensacola.

That, in October, 1763, the King of Great Britain issued a proclamation, creating four new colonies, Quebec, East Florida, West Florida, and Grenada ; and prescribing the bounds of each, and further declaring that all the lands between the Alatamaha, and St. Mary's should be annexed to Georgia. The same proclamation contained a clause reserving, under the dominion and protection of the crown, for the use of the Indians, all the lands on the western waters, and forbidding a settlement on them, or a purchase of them from the Indians. The lands conveyed to the plaintiff lie on the western waters.

That, in November, 1763, a commission was issued to the Governor of Georgia, in which the boundaries of that province are described, as extending westward to the Mississippi. A commission, describing boundaries of the same extent, was afterwards granted in 1764.

That a war broke out between Great Britain and her colonies, which terminated in a treaty of peace acknowledging them as sovereign and independent states.

That in April, 1787, a convention was entered into between the states of South Carolina and Georgia settling the boundary line between them.

The jury afterwards describe the situation of the lands mentioned in the plaintiff's declaration, in such manner that their lying within the limits of Georgia, as defined in the proclamation of 1763, in the treaty of peace, and in the convention between that state and South Carolina, has not been questioned.

The counsel for the plaintiff rest their argument on a single proposition. They contend that the reservation for the use of the Indians, contained in the pro-

FLETCHER
v.
PECK.

clamation of 1763, excepts the lands on the western waters from the colonies within whose bounds they would otherwise have been, and that they were acquired by the revolutionary war.   All acquisitions during the war, it is contended, were made by the joint arms, for the joint benefit of the United States, and not for the benefit of any particular state.

The court does not understand the proclamation as it is understood by the counsel for the plaintiff.   The reservation for the use of the Indians appears to be a temporary arrangement suspending, for a time, the settlement of the country reserved, and the powers of the royal governor within the territory reserved, but is not conceived to amount to an alteration of the boundaries of the colony.   If the language of the proclamation be, in itself, doubtful, the commissions subsequent thereto, which were given to the governors of Georgia, entirely remove the doubt.

The question, whether the vacant lands within the United States became a joint property, or belonged to the separate states, was a momentous question which, at one time, threatened to shake the American confederacy to its foundation.   This important and dangerous contest has been compromised, and the compromise is not now to be disturbed.

It is the opinion of the court, that the particular land stated in the declaration appears, from this special verdict, to lie within the state of Georgia, and that the state of Georgia had power to grant it.

Some difficulty was produced by the language of the covenant, and of the pleadings.   It was doubted whether a state can be seised in fee of lands, subject to the Indian title, and whether a decision that they were seised in fee, might not be construed to amount to a decision that their grantee might maintain an ejectment for them, notwithstanding that title.

The majority of the court is of opinion that the nature of the Indian title, which is certainly to be re-

spected by all courts, until it be legitimately extinguished, is not such as to be absolutely repugnant to seisin in fee on the part of the state.

Judgment affirmed with costs.

JOHNSON, J.   In this case I entertain, on two points, an opinion different from that which has been delivered by the court.

I do not hesitate to declare that a state does not possess the power of revoking its own grants.   But I do it on a general principle, on the reason and nature of things: a principle which will impose laws even on the deity.

A contrary opinion can only be maintained upon the ground that no existing legislature can abridge the powers of those which will succeed it.   To a certain extent this is certainly correct; but the distinction lies between power and interest, the right of jurisdiction and the right of soil.

The right of jurisdiction is essentially connected to, or rather identified with, the national sovereignty.   To part with it is to commit a species of political suicide, In fact, a power to produce its own annihilation is an absurdity in terms.   It is a power as utterly incommunicable to a political as to a natural person.   But it is not so with the interests or property of a nation. Its possessions nationally are in nowise necessary to its poll ical existence; they are entirely accidental, and may be parted with in every respect similarly to those of the individuals who compose the community. When the legislature have once conveyed their interest or property in any subject to the individual, they have lost all control over it; have nothing to act upon; it has passed from them; is vested in the individual; becomes intimately blended with his existence, as essentially so as the blood that circulates through his system.   The government may indeed demand of him the one or the other, not because they are not his, but because whatever is his is his country's.

As to the idea, that the grants of a legislature may be void because the legislature are corrupt, it appears to me to be subject to insuperable difficulties. The acts of the supreme power of a country must be considered pure for the same reason that all sovereign acts must be considered just; because there is no power that can declare them otherwise. The absurdity in this case would have been strikingly perceived, could the party who passed the act of cession have got again into power, and declared themselves pure, and the intermediate legislature corrupt.

The security of a people against the misconduct of their rulers, must lie in the frequent recurrence to first principles, and the imposition of adequate constitutional restrictions. Nor would it be difficult, with the same view, for laws to be framed which would bring the conduct of individuals under the review of adequate tribunals, and make them suffer under the consequences of their own immoral conduct.

I have thrown out these ideas that I may have it distinctly understood that my opinion on this point is not founded on the provision in the constitution of the United States, relative to laws impairing the obligation of contracts. It is much to be regretted that words of less equivocal signification, had not been adopted in that article of the constitution. There is reason to believe, from the letters of Publius, which are well known to be entitled to the highest respect, that the object of the convention was to afford a general protection to individual rights against the acts of the state legislatures. Whether the words, " acts impairing the obligation of contracts," can be construed to have the same force as must have been given to the words " obligation and *effect* of contracts," is the difficulty in my mind.

There can be no solid objection to adopting the technical definition of the word " contract," given by Blackstone. The etymology, the classical signification, and the civil law idea of the word, will all support it. But the difficulty arises on the word " obligation,"

which certainly imports an existing moral or physical necessity. Now a grant or conveyance by no means necessarily implies the continuance of an obligation beyond the moment of executing it. It is most generally but the consummation of a contract, is *functus officio* the moment it is executed, and continues afterwards to be nothing more than the evidence that a certain act was done.

I enter with great hesitation upon this question, because it involves a subject of the greatest delicacy and much difficulty. The states and the United States are continually legislating on the subject of contracts, prescribing the mode of authentication, the time within which suits shall be prosecuted for them, in many cases affecting existing contracts by the laws which they pass, and declaring them to cease or lose their effect for want of compliance, in the parties, with such statutory provisions. All these acts appear to be within the most correct limits of legislative powers, and most beneficially exercised, and certainly could not have been intended to be affected by this constitutional provision; yet where to draw the line, or how to define or limit the words, " obligation of contracts," will be found a subject of extreme difficulty.

To give it the general effect of a restriction of the state powers in favour of private rights, is certainly going very far beyond the obvious and necessary import of the words, and would operate to restrict the states in the exercise of that right which every community must exercise, of possessing itself of the property of the individual, when necessary for public uses ; a right which a magnanimous and just government will never exercise without amply indemnifying the individual, and which perhaps amounts to nothing more than a power to oblige him to sell and convey, when the public necessities require it.

The other point on which I dissent from the opinion of the court, is relative to the judgment which ought to be given on the first count. Upon that count we are

called upon substantially to decide, " that the state of Georgia, at the time of passing the act of cession, was legally seised in fee of the soil, (then ceded,) subject only to the extinguishment of part of the Indian title." That is, that the state of Georgia was seised of an estate in fee-simple in the lands in question, subject to another estate, we know not what, nor whether it may not swallow up the whole estate decided to exist in Georgia. It would seem that the mere vagueness and uncertainty of this covenant would be a sufficient objection to deciding in favour of it, but to me it appears that the facts in the case are sufficient to support the opinion that the state of Georgia had not a *fee-simple* in the land in question.

This is a question of much delicacy, and more fitted for a diplomatic or legislative than a judicial inquiry. But I am called upon to make a decision, and I must make it upon technical principles.

The question is, whether it can be correctly predicated of the interest or estate which the state of Georgia had in these lands, " that the state was seised thereof, in fee-simple."

To me it appears that the interest of Georgia in that land amounted to nothing more than a mere possibility, and that her conveyance thereof could operate legally only as a covenant to convey or to stand seised to a use.

The correctness of this opinion will depend upon a just view of the state of the Indian nations. This will be found to be very various. Some have totally extinguished their national fire, and submitted themselves to the laws of the states: others have, by treaty, acknowledged that they hold their national existence at the will of the state within which they reside: others retain a limited sovereignty, and the absolute proprietorship of their soil. The latter is the case of the tribes to the west of Georgia. We legislate upon the conduct of strangers or citizens within their limits, but innumerable treaties formed with them

acknowledge them to be an independent people, and the
uniform practice of acknowledging their right of soil,
by purchasing from them, and restraining all persons
from encroaching upon their territory, makes it unne-
cessary to insist upon their right of soil. Can, then,
one nation be said to be seised of a fee-simple in lands,
the right of soil of which is in another nation? It is
awkward to apply the technical idea of a fee-simple to
the interests of a nation, but I must consider an abso-
lute right of soil as an estate to them and their heirs.
A fee-simple estate may be held in reversion, but our
law will not admit the idea of its being limited after a
fee-simple. In fact, if the Indian nations be the abso-
lute proprietors of their soil, no other nation can be
said to have the same interest in it. What, then, prac-
tically, is the interest of the states in the soil of the
Indians within their boundaries? Unaffected by par-
ticular treaties, it is nothing more than what was assu-
med at the first settlement of the country, to wit, a
right of conquest or of purchase, exclusively of all
competitors within certain defined limits. All the re-
strictions upon the right of soil in the Indians, amount
only to an exclusion of all competitors from their
markets; and the limitation upon their sovereignty
amounts to the right of governing every person within
their limits except themselves. If the interest in Geor-
gia was nothing more than a pre-emptive right, how
could that be called a fee-simple, which was nothing
more than a power to acquire a fee-simple by pur-
chase, when the proprietors should be pleased to sell?
And if this ever was any thing more than a mere pos-
sibility, it certainly was reduced to that state when the
state of Georgia ceded, to the United States, by the
constitution, both the power of pre-emption and of
conquest, retaining for itself only a resulting right de-
pendent on a purchase or conquest to be made by the
United States.

I have been very unwilling to proceed to the deci-
sion of this cause at all. It appears to me to bear
strong evidence, upon the face of it, of being a mere
feigned case. It is our duty to decide on the rights,
but not on the speculations of parties. My confi-

dence, however, in the respectable gentlemen who have been engaged for the parties, has induced me to abandon my scruples, in the belief that they would never consent to impose a mere feigned case upon this court.