RIDDELL<br><i>v.</i><br>GORMLEY.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## BREAUX et al. *v.* JOHNS et al.

On the discovery of the American continent the principle was asserted or acknowledged by all European nations that discovery, followed by actual possession, gave title to the soil to the government by whose subjects, or by whose authority, it was made, not only against other European governments, but against the natives themselves. While the different nations of Europe respected the rights of the natives as occupants, they all asserted the ultimate dominion and title to the soil to be in themselves.

Indian tribes in Louisiana, to whom lands were allotted by the laws of Spain, were never invested by those laws, with the absolute ownership. The Indians were not permitted to dispose of those lands without being expressly authorized by the government. If all died or removed permanently, the lands reverted to the crown, not by forfeiture, but by the implied right of reversion; or, if the population of the Indian villages was greatly reduced in number, the remnants of several villages were united into one, and, in such case, they continued to hold so much of the land originally set apart for them as they stood in need of.

The ultimate right to the soil occupied by Indian tribes in Louisiana is in the United States, who can grant the soil while yet in the possession of the natives. Such grants convey title to the grantees, subject to the Indian right of occupancy.

APPEAL from the District Court of Iberville, *Penn*, J. *Labauve*, for the appellants. *W. E. Edwards*, for the defendants and warrantors. The judgment of the court was pronounced by

ROST, J. This is a suit for slander of title, in which the defendants have justified the slanders alleged, and plead title in themselves. The plaintiffs claim under a patent issued on a certificate of purchase from the United States, as authorized by the preëmption law of 1834. The defendants allege that they possess under the primitive owners of the soil, the Chetimacha tribe of Indians, by virtue of a lease and transfer, made in 1807 to their ancestor, *Nathaniel Cropper*, by the said Indians, for and during the term of ninety-nine years. They have called in warranty the Chetimachas, who have been made to appear in their national capacity, and to answer as follows: That the title to the land in controversy is in themselves, having been the owners and possessors thereof as far back as tradition, authentic history, or the memory of man runneth, and holding it by descent through many generations of their ancestors; that their nation were owners and possessors of said land, when the french nation first discovered it, and proclaimed its sovereignty over the territory of Louisiana; that the french and spanish governments recognized their title to the land, and by the treaties of Paris and San Ildefonso bound the United States government to do the same; that the United States government, in a compact with the territory of Louisiana, at the time of her admission into the Union, acknowledged the title of the warrantors to the land in controversy, and therefore the general government could not survey or alienate said land, without their consent. This defence was sustained in the court below, and plaintiffs appealed.

" In 1699, Iberville landed at Biloxi, crossed over to and passed up the Mississippi, which he explored, discovering the forks of the Chetimachas (now *bayou* Lafourche) and *bayou* Plaquemine. The country was then in possession of the Chetimacha tribe of Indians, from the *bayou* Plaquimine to the *bayou* Lafourche, as far as it can be ascertained." Martin's History of La. vol. 1, pp. 142–144. This historical fact is corroborated by the testimony of many old inhabitants of the country. It is proved that this tribe had two places of residence, one on *bayou* Jacob, near the Mississippi river, and the other on the *bayou* Plaquemine, adjoining the land in controversy, and that they occasionally removed from one place to the other. It is also shown that they had another village on bayou Têche; that their claims to the lands on *bayou* Jacob and *bayou* Têche have been confirmed by the United States, and that the application made to the board of commissioners, in 1807, for the confirmation of one thousand two hundred and three superficial arpents opposite the mouth of *bayou* Grosse Tête, and including the land in controversy, was rejected.

The plaintiffs rely upon the case of *Martin* v. *Johnson et al.*, 5 Martin's Rep. 655; and also upon the case of *Reboul* v. *Nero*, 5 Ibid., 490, which turned upon the title of this same tribe of Indians to the village on bayou Jacob. It was held by our predecessors, in those cases, that the lands assigned to Indian tribes by the spanish government were granted in full ownership, and that the government surveyors were bound to notice their location, and could not survey them as vacant. We are not prepared to give an unqualified assent to those propositions.

Upon the discovery of the American continent, the principle was asserted or acknowledged by all European nations, that discovery followed by actual possession gave title to the government by whose subjects or by whose authority it was made, not only against other European governments, but against the natives themselves. While the different nations of Europe respected the rights of the natives as occupants, they all asserted the ultimate dominion and title to be in themselves. *Johnson* v. *McIntosh*, 8 Wheaton, 543. *Worcester* v. *State of Georgia*, 6 Peters, 515. *Fletcher* v. *Peck*, 6 Cranch, 87.

Spain, besides claiming as other nations by right of discovery, rested her title to the soil upon the higher sanction of apostolic dispensation. In the exercise of a power then held to be divine, the Pope, Alexander VI, granted to Ferdinand and Isabella, all the lands discovered, or to be discovered, by their subjects on this continent, and the islands adjoining it. This grant is found *in extenso* in Solorzano, Politica Indiana, b. 1, ch. 10, nos. 23, 24. There can be no doubt from the words used, nor has it ever been doubted by the courts or government of Spain, that it was absolute, and vested in the sovereign, all the lands discovered or to be discovered, whether or not they were appropriated or occupied by the natives at the time of discovery. " The king," say Solorzano, " was *unico y absoluto dueño, de tierras, montes y pastos.*"

We must, therefore, ascertain whether the laws of Spain, after the discovery of America, restored the natives to the absolute ownership of the lands allotted to them, there being no doubt that those laws were enforced in Louisiana.

Isabella states in her will that, when she and her husband Ferdinand applied to the Pope for the grant already mentioned, their main object was to civilize the natives, and to convert them to christianity. In furtherance of those objects, it was ordained by the law 1st. tit. 3d, book 6th of the Recopilacion de leyes de Indias, that the Indians should be compelled to dwell in villages,

where they may more conveniently be instructed in the catholic faith, and the arts of civilized life. This law was carried into effect, and the nature of the title of the Indians to the lands allotted to them may be deduced from the other laws in the same book and title, and their commentary in the Politica Indiana. They could not dispose of those lands without an express authorization from government. If they all died, or removed permanently from the village, it reverted to the crown, not by forfeiture, but by the implied right of reversion. The villages and *reducciones* could be altered, and their location changed, with the authorization of the king, of the vice-king, or of the audiencia. Politica Indiana, book 2, ch. 24. nos. 42, 45. When the population o the villages had greatly diminished in numbers, the remnants of several villages were concentrated into one, and in that case they continued to hold only so much of the land originally set apart for them as they stood in need of.

In the case of *Martin* v. *Johnson et al.*, it was in evidence that the Pascagoula and Biloxi tribes of Indians had thus been removed to bayou Bœuf, and located on the *reduccion* of the Choctaws, with the consent of that tribe.

These regulations were substantially the same as were enforced by England in North America, and have been enforced by the United States since the revolution. In Louisiana, as in the other States, the nature of the Indian title was not such as to be repugnant to the right of ultimate dominion in the sovereign of the country. In the case of *Martin* v. *Johnson et al.*, the court was of opinion that under the 27th law, title 1, book 6, of the laws of the Indies, Indians could hold land as well as other people. That law only says that Indians can sell their lands when properly authorized to do so, and it provides that the sale must in all cases, under pain of nullity, be made at public auction, after thirty days advertizement. It appears to us that, by this sale, the Indians transferred their right of occupancy, and that the authorization of the government to sell was in the nature of a grant, and vested the title in the purchaser.

In the case of *Mitchell et al.* v. *The United States*, 11 Peters, 711, the Indian titles, under which the plaintiffs claimed, rested upon solemn treaties, entered into between Spain and the powerful tribes of Indians which then occupied the province of Florida. These treaties were in derogation of the laws of the Indies, and probably did vest the absolute title in the Indian tribes. But no such treaties were ever made with the tribes which inhabited Louisiana, and that case is not applicable to the one under consideration.

We believe the ultimate right to the soil occupied by the Indians to be in the United States, and that, as a consequence of this ultimate dominion, they have the power to grant that soil, while yet in possession of the natives. These grants convey a title to the grantees, subject only to the Indian right of occupancy. *Fletcher* v. *Peck.*

Applying these principles and laws to the present case, we find that the Chetimacha tribe of Indians had three villages, two of which have been recognized by the United States as properly located, and the claim to the other rejected.

The evidence in the record going to show that the rejected claim was a *reduccion* regularly made under the laws of the Indies is not satisfactory, nor does it seem to be in accordance with those laws that two such grants should have been made to the same tribe, within seven or eight miles of each other. But supposing the claim to be valid, the United States could grant the land it covers, subject to the right of occupancy of the Indians, and as they have

BREAUX
v.
JOHNS.

ceased to occupy the portion in controversy, since 1807, the plaintiffs are entitled to take possession of it, under their patent.

The defendants themselves appear to have considered the Indian title in that light, as they have claimed the right of preëmption by virtue of settlement and cultivation, and have purchased through error a lot within which they supposed the land in controversy to be situated.

The attempt of the defendants to recover from the Indians as warrantors, is preposterous. They, as well as those under whom they claim, well knew that the title under which they possess was an absolute nullity, from which no legal effects could result.

It is, therefore, ordered that the judgment in this case be reversed, and that there be judgment in favor of the plaintiffs; that the said plaintiffs be forever quieted in their possession and title to the lot described in their petition, against all claims or pretentions of the defendants. It is further ordered, that the claim of the defendants in warranty be dismissed, and that said defendants pay the costs in both courts.